## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|                                              |     |                                       |
|----------------------------------------------|-----|---------------------------------------|
| ADIDAS AG and ADIDAS AMERICA, INC.,          | )   |                                       |
|                                              | )   |                                       |
| Plaintiffs,                                  | )   |                                       |
|                                              | )   |                                       |
| vs.                                          | )   | Civil Action No. 16-52-LPS-CJB        |
|                                              | )   |                                       |
| UNEQUAL TECHNOLOGIES COMPANY, and MATSCITECHNO LICENSING COMPANY, | )   |                                       |
|                                              | )   |                                       |
| Defendants.                                  | )   |                                       |

## REPORT AND RECOMMENDATION

In this patent action filed pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, Plaintiffs adidas AG and adidas America, Inc. (collectively, "adidas" or "Plaintiffs") have sued Defendants UNEQUAL Technologies Company ("UNEQUAL") and Matscitechno Licensing Company ("Matscitechno") (collectively, "Defendants"). (D.I. 1) Presently pending before the Court is Defendants' motion to dismiss the Complaint, filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), as well as 28 U.S.C. § 2201(a) (the "Motion"). (D.I. 9) For the reasons that follow, the Court recommends that Defendants' Motion be GRANTED-IN-PART and DENIED-IN-PART.

## I.      BACKGROUND

### A.      The Parties

Plaintiff adidas AG is a corporation organized under the laws of the Federal Republic of Germany, with its principal place of business in Herzogenaurach, Germany. (D.I. 1 at ¶ 2) Plaintiff adidas America, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in Portland, Oregon. (*Id.* at ¶ 3) adidas AG indirectly owns 100

percent of the shares of both adidas America, Inc. and third-party Reebok International Ltd. ("Reebok"). (D.I. 14, ex. A at 251, 252)[1]

Defendant UNEQUAL is a corporation organized and existing under the laws of the Pennsylvania, with a principal place of business in Glen Mills, Pennsylvania. (D.I. 1 at ¶ 4) Defendant Matscitechno is a corporation organized and existing under the laws of Pennsylvania, with a principal place of business in Kennett Square, Pennsylvania. (*Id.* at ¶ 5)

### B.    Factual Background

On July 29, 2015, Defendants filed a Complaint in this Court against Reebok alleging, *inter alia*, infringement of three patents: United States Patent No. 6,837,812 (the "'812 patent"); United States Patent No. 6,935,973 (the "'973 patent"); and United States Patent No. 7,171,696 (the "'696 patent") (collectively, the "patents-in-suit").[2] (D.I. 1 at ¶ 15; *see also* D.I. 1, Civil Action No. 15-653-LPS)[3] In that case (the "Reebok case"), "Defendants initially sought a preliminary injunction, contending that Reebok had infringed the patents-in-suit and were causing irreparable harm by offering for sale and selling certain coated Kevlar products." (D.I. 1 at ¶ 16) Defendants specifically identified the "Reebok Kevlar® CrossFit collection" as infringing products, alleging that "Reebok products incorporating coated Kevlar® are infringing

---

[1]     Specifically, "adidas America, Inc. is a wholly owned subsidiary of adidas North America, Inc., which is a wholly owned subsidiary of adidas International B.V., which is wholly owned (directly and indirectly) by Plaintiff adidas AG. . . . [Reebok] is a wholly owned subsidiary of adidas North America, Inc." (D.I. 14 at ¶ 2)

[2]     UNEQUAL is the exclusive licensee of the patents-in-suit; Matscitechno owns the patents-in-suit. (D.I. 1 at ¶ 13)

[3]     Unless otherwise noted, citations herein refer to the docket in this action, Civil Action No. 16-52-LPS-CJB.

the patents-in-suit[.]" (*Id.* (internal quotation marks and citations omitted); *see also* D.I. 1 at ¶ 36, Civil Action No. 15-653-LPS) As discovery progressed in the Reebok case, "Defendants sought discovery into not only Reebok products that used Kevlar® components, but also adidas products that contain Kevlar®." (D.I. 1 at ¶ 18) On October 20, 2015, for example, Defendant UNEQUAL issued a set of requests for production that defined "Accused Products" to mean "any and all Reebok or adidas products that contain Kevlar." (*Id.* (internal quotation marks omitted); *see also* D.I. 1, ex. E. at ¶ 1) adidas AG and adidas America Inc. both "make, sell, offer for sale or import into the United States products that contain Kevlar®." (D.I. 1 at ¶ 19)

By January 15, 2016, UNEQUAL had determined that "Reebok's commercial activities related to the Reebok Accused Products [were] not of a scope or nature sufficient to warrant the substantial time and expense of continued litigation against [it.]" (D.I. 1, ex. G at 1; *see also* D.I. 1 at ¶ 20) On that date, as part of a proposed stipulation to dismiss the Reebok case, Defendants sent to Reebok a covenant not to sue on the patents-in-suit (the "First Covenant"). (D.I. 1 at ¶ 20 & ex. G) The First Covenant reads, in part, as follows:

> UNEQUAL Technologies Company and Matscitechno Licensing Company, for an on behalf of themselves, their parents, subsidiaries, divisions, related companies, affiliated companies, licensees, assigns, and/or other related business entities, as well as any of their predecessors, successors, directors, officers, employees, agents, distributors, attorneys, representatives, and employees of such entities, hereby unconditionally and irrevocably covenant to refrain from making any claim(s) or demand(s), or from commencing, causing, or permitting to be prosecuted any action in law or equity, against Reebok or any of its subsidiaries, divisions, related companies, affiliated companies, licensees, assigns, and/or other related business entities, as well as any of their predecessors, successors, directors, officers, employees, agents, distributors, attorneys, representatives, and employees of such entities and all customers of each of the foregoing, for any past, present, or future

infringement of the patents-in-suit by the Reebok Accused Products
or by any other product currently or previously made, used, sold,
offered for sale, and/or imported into the United States by Reebok,
or by any products that are not colorably different from the Reebok
Accused Products or any other Reebok product currently or
previously made, used, sold, offered for sale, and/or imported into
the United States by Reebok.

(D.I. 1, ex. G at 2)

On January 20, 2016, Matias Ferrario, counsel for Reebok, e-mailed Felicia Boyd,

counsel for UNEQUAL, requesting a call "to discuss the proposed covenant not to sue[.]" (D.I.

1, ex. H at 2; *see also* D.I. 1 at ¶ 23).  In response, Ms. Boyd asked Mr. Ferrario to send "any

proposed changes [that Reebok counsel had] with respect to the stipulation for dismissal." (D.I.

1, ex. H at 2)  She also stated that the First Covenant "is not a draft covenant.  It is a final

executed document."  (*Id.*; *see also* D.I. 1 at ¶ 23)  In the same e-mail, however, Ms. Boyd

requested that Mr. Ferrario send any "question or proposed revision" regarding the First

Covenant to her.  (D.I. 1, ex. H at 2)

Reebok requested two "revis[ions]" to the First Covenant.  (D.I. 1, ex. H at 1)  One of

these changes was to correct a typographical error—to fix a mistake in which the names of the

parties had been transposed.  (*Id.*)  Second, Mr. Ferrario, noting that UNEQUAL had sought

discovery of adidas products and at times had defined accused products to include adidas

products, requested that "the covenant be stated to more expressly encompass adidas products."

(D.I. 1, ex. H at 1; *see also* D.I. 1 at ¶ 24)  In the e-mail requesting these revisions, Mr. Ferrario

stated that "[o]ur comments on the proposed dismissal are contingent on [UNEQUAL] accepting

these changes."  (D.I. 1, ex. H at 1)  UNEQUAL agreed to correct the typographical error, but

Ms. Boyd stated that the First Covenant "will not be expanded to include [a]didas, a non-party to

4

this action." (*Id.*)

The following day, on January 21, 2016, UNEQUAL sent a revised stipulation of dismissal of the patent infringement claims in the Reebok case, and also attached what it referred to as "a revised, executed Covenant Not to Sue[.]" (D.I. 1, ex. J)  This revised covenant (the "Second Covenant") was substantially identical to the First Covenant, except for an additional sentence, which provided: "For avoidance of doubt, this Covenant does not include any products other than the Reebok Accused Products and those Reebok products not colorably different and does not include any product currently made, used, offered for sale, or sold by [a]didas AG or any other [a]didas Group entity." (D.I. 1, ex. I at 2)

On January 22, 2016, the parties in the Reebok case stipulated to dismissal with respect to all claims and defenses regarding the patents-in-suit.  (D.I. 85, Civil Action No. 15-653-LPS)

### C.     Procedural Background

On January 29, 2016, Plaintiffs filed the Complaint in this matter, seeking declarations that (1) the First Covenant is a fully binding and enforceable covenant not to sue that applies to adidas and any of its products that are not colorably different from the "'Accused Reebok Products'" or pre-existing Reebok products; or that (2) alternatively, the First Covenant is fully enforceable and extends to any adidas products that contain Kevlar, as those products are not colorably different from the "Reebok Accused Products"; and also that (3) adidas does not infringe the three patents-in-suit—the same three patents that were at issue in the Reebok case. (D.I. 1 at ¶¶ 27-35)  On February 9, 2016, Chief Judge Leonard P. Stark referred this case to the Court for resolution of all matters relating to scheduling and to resolve any motions to dismiss, stay, or transfer venue that are filed in the case.  (D.I. 6)

In lieu of filing an Answer to Plaintiffs' Complaint, on April 28, 2016, Defendants filed the instant Motion, seeking dismissal for failure to state a claim and for lack of subject matter jurisdiction. (D.I. 9)  Briefing on the Motion was completed on June 6, 2016. (D.I. 16)

## II.     STANDARD OF REVIEW

### A.     Motion to Dismiss for Failure to State a Claim

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  In assessing the plausibility of a claim, the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

6

to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

### B.      Motion to Dismiss for Lack of Subject Matter Jurisdiction

Rule 12(b)(1) authorizes dismissal of a complaint for lack of subject matter jurisdiction. "Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact)." *Kuhn Constr. Co. v. Diamond State Port Corp.*, Civ. No. 10-637-SLR, 2011 WL 1576691, at *2 (D. Del. Apr. 26, 2011). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). "In reviewing a factual attack, the court may consider evidence outside the pleadings." *Id.* Defendants' attack here is a facial one, as it focuses on the allegations in adidas' Complaint and why those allegations assertedly do not give rise to subject matter jurisdiction. (D.I. 10 at 8-11; D.I. 16 at 2-6); *see also TSMC Tech., Inc. v. Zond, LLC*, Civil Action No. 14-721-LPS-CJB, 2015 WL 661364, at *3 (D. Del. Feb. 13, 2015); *Intel Corp. v. Future Link Sys., LLC*, Civil Action No. 14-377-LPS, 2015 WL 649294, at *3 (D. Del. Feb. 12, 2015).

The Declaratory Judgment Act requires that a "case of actual controversy" exist between the parties before a federal court may exercise jurisdiction. 28 U.S.C. § 2201(a). In determining whether there is subject matter jurisdiction over declaratory judgment claims, a court should ask "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S.

7

118, 127 (2007) (internal quotation marks and citation omitted) (noting that the Declaratory

Judgment Act's requirement that a "'case of actual controversy'" exist is a reference to the types

of cases and controversies that are justiciable under Article III); *see also Prasco, LLC v. Medicis*

*Pharm. Corp.*, 537 F.3d 1329, 1335-36 (Fed. Cir. 2008).  A case or controversy must be "based

on a *real* and *immediate* injury or threat of future injury that is *caused by the defendants*—an

objective standard that cannot be met by a purely subjective or speculative fear of future harm."

*Prasco*, 537 F.3d at 1339 (emphasis in original).  When the conduct of the patentee can be

"reasonably inferred as demonstrating intent to enforce a patent" against the declaratory

judgment plaintiff, subject matter jurisdiction will arise, even when that intent is demonstrated

implicitly.  *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363-64 (Fed. Cir. 2009).

     A decision as to whether an actual controversy exists in the context of a patent

declaratory judgment claim "will necessarily be fact specific and must be made in consideration

of all the relevant circumstances."  *W.L. Gore & Assocs, Inc. v. AGA Med. Corp.*, Civil No. 11-

539 (JBS-KMW), 2012 WL 924978, at *4 (D. Del. Mar. 19, 2012) (citing *MedImmune*, 549 U.S.

at 127).  The burden is on the party asserting declaratory judgment jurisdiction (here, Plaintiffs)

to establish that an Article III case or controversy existed at the time that the claim for declaratory

relief was filed, and that it has continued since.  *Danisco U.S. Inc. v. Novozymes A/S*, 744 F.3d

1325, 1329 (Fed. Cir. 2014); *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, Civ. No. 12-1301-

SLR, 2013 WL 1856308, at *1 (D. Del. May 2, 2013).

**III.    DISCUSSION**

     Defendants argue that Plaintiffs have failed to state a claim upon which relief can be

granted under Rule 12(b)(6) because Plaintiffs are not covered by an operative covenant not to

8

sue and because the First Covenant did not apply to adidas products.[4] (D.I. 10 at 11-17; D.I. 16 at 6-9) Defendants also assert that the facts pleaded regarding UNEQUAL's actions do not give rise to subject matter jurisdiction under Rule 12(b)(1) for a declaratory judgment of non-infringement. (*See* D.I. 10 at 7-11; D.I. 16 at 2-5) The Court will address each of these arguments in turn.

### A.    Applicability of the First Covenant Not to Sue

As was noted above, Count I of the Complaint seeks a Declaration that "the First Covenant is enforceable and applies to any adidas products that are not colorably different from the Accused Reebok Products or pre-existing Reebok products[.]" (D.I. 1 ¶ 31; *see also id.* at 8) Alternatively, Plaintiffs seek a declaration that "the First Covenant is enforceable and any adidas products that contain Kevlar are not colorably different from the Reebok Accused Products or pre-existing Reebok products[,]" and thus fall within the scope of the First Covenant. (*Id.* at ¶ 31; *see also id.* at 8).

If the First Covenant is unenforceable, however, then the question of whether its protection extends to adidas products is moot. Therefore, the Court will first address the enforceability of the First Covenant. The enforceability of a covenant not to sue is a matter that the Court may assess at the motion-to-dismiss stage. *See, e.g., Tyco Fire Prods. LP v. Victaulic Co.*, Civil Action No. 10-4645, 2012 WL 39956, at *7 (E.D. Pa. Jan. 6, 2012); *Skilstaf, Inc. v.*

---

[4]    Defendants also argue that the Court lacks subject matter jurisdiction over Plaintiffs' claim that they are subject to a covenant not to sue. (D.I. 10 at 17; D.I. 16 at 10) The Court will address the covenant-not-to-sue claim ("Count I") only through the Rule 12(b)(6) lens for two reasons. First, the parties' briefing regarding Count I focuses primarily on whether Count I adequately states a claim under Rule 12(b)(6). (*See* D.I. 10 at 11-17; D.I. 13 at 6-13; D.I. 16 at 6-10) Second, the Court's finding that there can be no plausible claim that the First Covenant is enforceable, discussed below, demands dismissal of the claim under either theory.

*CVS Caremark Corp.*, No. C 09-02514 SI, 2010 WL 199717, at *4-5 (N.D. Cal. Jan. 13, 2010);

*Christakis v. Mark Burnett Prods.*, No. CV 08-6864-GW (JTLx), 2009 WL 1248947, at *4 (C.D.

Cal. Apr. 27, 2009); *Oakley, Inc. v. Bolle Am. Inc.*, No. SA CV 91-634-LTL(RWRx), 1992 WL

117445, at *4 (C.D. Cal. Mar. 26, 1992).

Ordinarily, as an initial matter, the Court would undertake a choice-of-law analysis to

determine what law applies to the issue of the First Covenant's enforceability. In actions

invoking federal question jurisdiction, such as this one, the Court relies on the "most significant

relationship" test, defined in Section 188 of the Restatement (Second) of Conflict of Laws. *See*

*Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1359-61 (D. Del. 1993). The

forum that has the most significant relationship to the First Covenant is likely either Delaware (as

the covenant arose in the context of settling a lawsuit filed in Delaware) or Pennsylvania (where

UNEQUAL, the party allegedly bound by the covenant, is incorporated and has its principal

place of business). Because the parties did not brief the issue of what law should apply in

determining whether or not the First Covenant is valid,[5] the Court assumes that the law of these

states (or any other state whose law might apply) would not differ materially, and that application

of any particular state's law would not impact the Court's reasoning below or change the

outcome here.

In determining whether the First Covenant is enforceable, the key dispute is over whether

the Second Covenant supersedes the First Covenant (as Defendants suggest) or whether the First

---

[5] In their briefing, Plaintiffs offer no suggestion as to what law applies. For their part, Defendants at one point rely on "Delaware principles of contract interpretation" in arguing for their preferred construction of the First Covenant, (D.I. 16 at 10 (internal quotation marks and citations omitted)), but provide no substantive analysis of the choice-of-law issue.

10

Covenant and Second Covenant are both in effect (as Plaintiffs suggest). Here, the Court sides

with Defendants. The parties' communications regarding the two covenants clearly establish that

they are not separate, equally binding documents, but that the Second Covenant is the revised,

operative version of the (draft) First Covenant.

Instructive to the Court's analysis was the result in *Server Technology, Inc. v. American

Power Conversion Corp.*, No. 3:06-CV-00698-LRH-VPC, 2014 WL 2772307 (D. Nev. June 18,

2014). In *Server Technology*, the plaintiff ("STI") offered the defendant ("APC") two separate

covenants not to sue. 2014 WL 2772307, at *2. The court found that "before [it could]

determine the scope of the covenant, [it] must first determine which covenant is the operative

covenant in this action." *Id.* In the initial covenant, dated April 22, 2014, STI covenanted not to

sue APC for infringement of one asserted claim ("claim 1") of one of the patents-in-suit (the

"'543 patent"), based on APC's manufacture, importation, use, sale or offer for sale of any

products "that exist as of the date of this letter, or that have existed at any time in the past." *Id.*

But in response, APC "repeatedly stated that the [proposed] covenant failed to protect its

interests or offered it sufficient protection[,]" in that, for example, the proposed covenant did not

cover "future APC products." *Id.* at *3. APC thus "rejected the April 22nd covenant and

requested [that] STI provide a full covenant not to sue that fixed these identified deficiencies[.]"

*Id.* In response to these concerns, STI offered a second covenant not to sue for infringement of

claim 1, which was dated May 2, 2014. *Id.* at *2. The May 2nd covenant now stated that it

"'shall apply not only to claim 1 of the '543 patent . . . but also to any claim that is identical in

scope to claim 1 of the '543 patent that has issued or may in the future issue from any application

that is a continuation, continuation-in-part, or divisional from the application of the '543

11

patent[]'" and also stated that it applied to "'any past, present or future product, that exists as of the date of this letter . . ., that has existed at any time in the past, or that APC will introduce in the future.'" *Id.* at *2-3 (citation omitted).

"In its motion for summary judgment, APC argue[d] that the April 22nd covenant [was] the operative covenant for the court's consideration because it was 'unconditional' and did not require any action by APC." *Id.* at *3 (citation omitted).  But the *Server Technology* Court disagreed, for two reasons.  First, the Court concluded that "STI received no consideration for the April 22nd covenant" because—even pursuant to that covenant's terms—the validity of claim 1 would remain "'very much in this case[.]'" *Id.*  Second, "and more importantly," the *Server Technology* Court found that the April 22nd covenant was not the operative covenant because it was "rejected by APC." *Id.*  The Court noted that throughout the parties' back-and-forth regarding the covenant, "APC repeatedly stated that the [April 22nd] covenant failed to protect its interests or offered it sufficient protection, particularly in regard to future APC products." *Id.* The *Server Technology* Court noted that these concerns were what led STI to offer the May 2nd covenant, which was "accepted by APC[.]" *Id.*  For these reasons, the *Server Technology* Court found that the "May 2nd covenant not to sue is the operative covenant in this action." *Id.*[6]  It then proceeded to analyze only the second covenant in reaching its decision as to whether the scope of that covenant encompassed STI's remaining infringement claims. *See id.* at *4.

The Court acknowledges that, as Plaintiffs note, the first basis for the *Server Technology* Court's decision—that the first covenant could not be enforceable because STI would have

---

[6]     The *Server Technology* Court also noted its view that the May 2nd covenant contained adequate consideration, in that, at the time it was offered, "validity of Claim 1 was no longer an issue in this action." *Server Tech.*, 2014 WL 2772307, at *3.

received no consideration for its promise not to sue—is not a premise universally recognized by all courts. Plaintiffs, for example, point to the decision in *Merck & Co., Inc. v. Watson Laboratories., Inc.*, No. C.A. 05-658(GMS), 2006 WL 1537375 (D. Del. June 2, 2006), for the proposition that independent consideration is not required to establish the enforceability of a unilateral covenant not to sue.  (D.I. 13 at 10)  In *Merck*, the defendant had argued that the plaintiff's covenant not to sue was unenforceable due to a lack of consideration.  2006 WL 1537375, at *1.  The *Merck* Court disagreed with that line of reasoning.  In doing so, it noted that in *Super Sack Manufacturing Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995), the United States Court of Appeals for the Federal Circuit had found that a plaintiff was bound by a promise not to sue the defendant, even though in that case, as far as the *Merck* Court was "able to discern, the promise upheld . . . was similarly unaccompanied by consideration[.]" *Id.* In the end, the *Merck* Court did not allow the "lack of consideration" argument to stand in the way of its conclusion that the relevant covenant at issue was in effect. *Id.*

On the other hand, however, federal courts (citing to the law of various states) have often noted that (at least pursuant to the law of the states at issue) a covenant not to sue is a type of contract that must be supported by consideration. *See, e.g., W. Chelsea Builds., LLC v. United States*, 109 Fed. Cl. 5, 17 (Fed. Cl. 2013) (interpreting New York law); *Wiggins v. Hitchens*, 853 F. Supp. 505, 514 (D.D.C. 1994) (interpreting District of Columbia law).  Additionally, at least one Delaware state court has suggested that covenants not to sue are contracts under Delaware law (one of the likely sources of applicable law in the instant case). *See Yucaipa Am. All. Fund I, LP v. SBDRE LLC*, C.A. No. 9151-VCP, 2014 WL 5509787, at *15 n.67 (Del. Ch. Oct. 31, 2014).

The Court need not resolve this "lack of consideration" issue now, however, because the second, "most important[]" reason behind the *Server Technology* Court's decision applies with equal force here, and suggests the correct outcome.[7]  Just as in *Server Technology*, here the record (including extrinsic evidence attached as exhibits to the Complaint, which both sides address) overwhelmingly indicates that the First Covenant was not operative, because even after it was sent to Reebok, the parties were still negotiating over the final form that the covenant would take.  The Court comes to this conclusion for a few reasons.

First, after it received the First Covenant from UNEQUAL on January 15, 2016, (D.I. 1 at ¶ 20), Reebok's communications indicated that it believed the First Covenant had not yet been finalized.  For example, Reebok (1) immediately requested that UNEQUAL "revise" what Reebok referred to as the "proposed" covenant, so that it, *inter alia*, more "expressly encompass[ed]" adidas products; and (2) noted that its "comments on the proposed dismissal [were] contingent on [UNEQUAL] accepting [its proposed] changes" to the covenant.  (D.I. 1, ex. H at 1-2; *see also* D.I. 1 at ¶ 24)  In doing so, Reebok was explaining that it was "unclear" about what the terms of the First Covenant meant (and what the covenant covered)—sufficiently so that it was asking that wording of the covenant be "modif[ied]" in a new, different version of the document, all in order that its preferred meaning be made more clear.  (D.I. 1 at ¶ 24)[8]

---

[7]  Defendants assert, and Plaintiffs do not dispute, that the Second Covenant (unlike the first) was met with consideration flowing from Reebok to UNEQUAL, in that after the Second Covenant was agreed to, "UNEQUAL received consideration through a dismissal and Reebok demonstrated acceptance by agreeing to the dismissal."  (D.I. 10 at 16)

[8]  Plaintiffs assert that "Reebok did not 'reject' the First Covenant in the same way APC rejected the first covenant STI issued in *Server Technolog[y]*" because although Reebok "requested clarification regarding the applicability of the First Covenant to adidas products[,]" Reebok "did not dispute nor question the enforceability of the First Covenant as to UNEQUAL's

Second, in response to Reebok's requests, UNEQUAL's communications also indicated that it believed the First Covenant had not yet been finalized. For example, UNEQUAL explained that it would "correct" certain aspects of the First Covenant, (D.I. 1, ex. H at 1), and then sent what it itself termed a "revised, exectued" version of the covenant (the Second Covenant), one that had been "revised . . . to make clear . . . that the Covenant expressly excludes[,] for the avoidance of any doubt, [a]didas and its activities[,]" (D.I. 1, ex. J at 1). UNEQUAL thus twice noted that the Second Covenant was a "revised" version of the First Covenant—one that, as it turned out, did not give Reebok the benefit it was seeking as to adidas products, in that the Second Covenant now included a sentence that explicitly excluded adidas products from the scope of the covenant. It is true, as Plaintiffs note, (D.I. 13 at 9), that at one point in this exchange, UNEQUAL had described the First Covenant as "not a draft covenant [but] a final executed document." (D.I. 1, ex. H at 2) Yet in the very next sentence of the very same e-mail, UNEQUAL also requested that Reebok send it any "proposed revision" to the First Covenant—indicating again that, in reality, the covenant's terms had not yet been finalized. (D.I. 1, ex. H at 2) And one day after receiving Reebok's proposed revisions, (D.I. 1, ex. H at 1), UNEQUAL sent Reebok a revised stipulation of dismissal and the Second Covenant, (D.I. 1, ex. J).

---

infringement claims against Reebok's products or Reebok's defenses related to the invalidity of the patents-in-suit." (D.I. 13 at 12) But the clear indication from the *Server Technology* Court was that, in noting that APC had "rejected" the terms of the first covenant, what the Court was saying was that the covenant itself was still a work in progress—one that was to be further revised before it was completed, in order to satisfy APC's demands. Put differently, the substance of STI's promise not to sue was still uncertain and in flux, and not until the second covenant was issued were the terms of that promise finalized and made clear. In this way, the circumstances of *Server Technology* and this case are in fact very similar.

Third, the parties' subsequent, joint actions also demonstrate that the First Covenant is not the operative covenant here. Recall that it was only after UNEQUAL issued the executed Second Covenant on January 21, 2016, (D.I. 1, ex. I), that the parties then stipulated to dismissal of the Reebok case. This too strongly indicates that the covenant at issue was a work in progress up until the Second Covenant was signed by UNEQUAL. That is, only after the parties were both clear on what the covenant did and did not cover (i.e., only after the Second Covenant was executed) did they both agree to take the necessary steps to end the Reebok case. *Cf. Trombley v. Nat'l City Bank*, 759 F. Supp. 2d 20, 30 (D.D.C. 2011) ("Generally, covenants not to sue in settlement agreements are not effective until final approval of the settlement.") (citing cases).

Even reading the Complaint and materials attached thereto in the light most favorable to the Plaintiff, as the Court must do when addressing a Rule 12(b)(6) motion, there is no plausible claim that the First Covenant is enforceable. Thus, it cannot apply with any legal force to Defendants, and the Court need not address the question of whether its terms cover adidas products. For the reasons set out above, then, the Court finds that Plaintiffs have not stated a legally cognizable claim for declaratory judgment as to the enforceability and applicability of the First Covenant.

**B.    Subject Matter Jurisdiction**

Count II of adidas' Complaint seeks a declaration that it does not infringe the patents-in-suit. (D.I. 1 at ¶¶ 32-35) Defendants assert that "adidas has not pled any facts that would give rise to subject matter jurisdiction for a declaration of non-infringement[.]" (D.I. 10 at 7) Plaintiffs' assertion to the contrary—that there is a case or controversy between Defendants and adidas—is based on Defendants' actions in the Reebok case. (D.I. 13 at 14)

16

"[D]eclaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee." *SanDisk Corp. v. STMicroelectronics., Inc.*, 480 F.3d 1372, 1380-81 (Fed. Cir. 2007). "But Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *Id.* at 1381.

The mere fact that Defendants had "filed infringement suits against other parties for other products[,]" does not, "in the absence of any act directed toward [Plaintiffs], meet the minimum standard" for declaratory judgment jurisdiction. *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1382 (Fed. Cir. 2010). This is so even where, as here, a defendant had previously sued one of a plaintiff's subsidiaries. *Cf. Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1349 (Fed. Cir. 2010) (finding that whether the declaratory judgment defendant sought to assert a patent against the declaratory judgment plaintiff's parent company was "irrelevant to whether a controversy exists between [the parties] in the case at bar.").

Plaintiffs' Complaint, however, goes beyond simply alleging that Defendants had previously sued Reebok. Plaintiffs further assert that during the course of discovery in the Reebok case, Defendants sought discovery into *adidas* products. (D.I. 1 at ¶ 18) One of Defendants' requests for production, for example, expressly identified "'adidas products that contain Kevlar'" as "'Accused Products.'" (*Id.*; *see also* D.I. 1, ex. E at 1) At the time and thereafter, both adidas AG and adidas America, Inc. made, sold, offered for sale or imported in the United States products that contain Kevlar (e.g., lines of soccer cleats), including certain

17

products that Plaintiffs describe in the Complaint. (D.I. 1 at ¶ 19)[9]

The Court agrees with Plaintiffs that declaratory judgment jurisdiction exists as to Count II. When UNEQUAL, during its litigation over the patents-in-suit with a company associated with Plaintiffs (Reebok), repeatedly[10] referred to "adidas" products containing Kevlar as "Accused Products," it was then reasonable for Plaintiffs to think that UNEQUAL believed that such products infringed the patents-in-suit. Indeed, in the context of a patent infringement case, that is what the term "Accused Products" suggests. As a result, it seems strange to ask whether, at the time of the instant suit, there was a "substantial controversy" brought on by UNEQUAL about whether adidas' products at issue infringed the patents-in-suit. UNEQUAL had, after all, already pretty clearly stated that they did.

UNEQUAL's communications in the Reebok case thus amounted to affirmative acts that threatened future injury to any adidas companies that made, used, sold, or offered for sale Kevlar products similar to Reebok's accused Kevlar products. *See Prasco*, 537 F.3d at 1339. And though these were acts of UNEQUAL that were initially directed to Reebok, UNEQUAL had to

---

[9]     In the instant Complaint, of course, Plaintiffs allege that their products containing Kevlar do not, in fact, infringe the patents-in-suit. (D.I. at ¶ 26)

[10]     It is a reasonable inference from the allegations in the Complaint that UNEQUAL referred to adidas products containing Kevlar as "Accused Products" not just once (and not by mistake), but instead repeatedly throughout the Reebok case. The Complaint notes that UNEQUAL sought discovery regarding adidas products "[d]uring the course of discovery" in the Reebok case, and it attaches an exhibit of one "example" of that: an October 2015 set of UNEQUAL requests for production. (D.I. 1 at ¶ 18) And, though the Court does not explicitly consider them here in resolving this facial challenge to subject matter jurisdiction, it is worth noting that Plaintiffs have asserted in their answering brief that UNEQUAL thereafter continued to seek discovery regarding adidas "Accused Products" for months, up through the time in which UNEQUAL and Reebok began their discussions regarding a resolution of the Reebok case in January 2016. (D.I. 13 at 3-4, 15)

know that its threats would soon get back to Plaintiffs (one of which is Reebok's ultimate parent). Clearly they did.

Moreover, any fears that these threats generated in Plaintiffs would not have been assuaged by UNEQUAL's communications in the Reebok case regarding the above-referenced covenant not to sue. Reebok requested that adidas products be covered by that covenant, but UNEQUAL ultimately rejected that request. Instead, UNEQUAL fashioned a Second Covenant that clearly excluded adidas products. In a vaccum, of course, this response from UNEQUAL would not generate declaratory judgment jurisdiction. After all, adidas was not a party to the Reebok case. Moreover, UNEQUAL was under no obligation to determine, "at the time and place of [a] competitor's choosing [or here, a competitor's subsidiary's choosing], that it will never bring an infringement suit [against adidas]." *Id.* at 1341. But a "patentee's refusal to give assurances that it will not enforce its patent is [a factor] relevant to the determination [regarding subject matter jurisdiction.]" *Id.* (internal quotation marks and citation omitted). And it would have been particularly "relevant" to adidas, since UNEQUAL had just spent months suggesting that it *was* accusing adidas' products of patent infringement.

The Court agrees with Plaintiffs that the result in *W.L. Gore & Associates, Inc. v. AGA Medical Corp.*, Civil No. 11-539 (JBS-KMW), 2012 WL 924978 (D. Del. Mar. 19, 2012), while not exactly on all fours with this case, provides some support for the Court's decision here. (D.I. 13 at 16) In *W.L. Gore*, at the time the plaintiff ("Gore") brought a declaratory judgment action in this Court, the patentee ("AGA") had already sued Gore for patent infringement in the United States District Court for the District of Minnesota ("the Minnesota case"). *See W.L. Gore*, 2012 WL 924978, at *2. Roughly seven months after filing suit in the Minnesota case, AGA became

19

aware of an additional potentially infringing Gore product (the "GSO") and served discovery requests in the case seeking information about that product. *Id.* When Gore refused to provide the requested discovery, "AGA requested that Gore stipulate to a waiver of any possible laches defense against a future patent infringement action brought by AGA against the GSO." *Id.* When the declaratory judgment action regarding the GSO product was later filed in this Court, this Court found that subject matter jurisdiction existed. It noted in support that not only did the two parties "have an immediate history of patent infringement controversy[,]" *id.* at *8, but that the declaratory judgment defendant had "demanded, [during that earlier-filed] patent infringement suit, that [the declaratory judgment] Plaintiff turn over details about the product because [the declaratory judgment] Defendant sought the right to add a claim of infringement regarding that product[,]" *id.* at *7.

As noted above, there are certainly differences between the facts in *W.L. Gore* and the facts here. adidas, for example, can point to no history of patent infringement litigation between the *parties* in this action (though UNEQUAL has previously litigated the patents-in-suit, and has done so against Reebok, the indirect subsidiary of one of the Plaintiffs). But in both *W.L. Gore* and here, the patentee had taken direct action in another litigation indicating, at a minimum, its strong "suspicions" that the declaratory judgment plaintiffs' products infringed its patents. *Id.* at *7. Indeed, here, one can easily read UNEQUAL's words as amounting to more than articulating "suspicions"—and instead as amounting to firm statements that any adidas entities' products containing Kevlar infringed the patents-in-suit. *Cf. Positec USA, Inc. v. Milwaukee Elec. Tool Corp.*, C.A. No. 05-890 GMS, 2006 WL 2726728, at *3-4 (D. Del. Sept. 25, 2006) (finding subject matter jurisdiction to exist as to claims filed by a declaratory judgment plaintiff, where

20

the declaratory judgment defendant had previously accused the plaintiff's sister company of infringing its patents, and had sent a letter to the sister company strongly suggesting that whichever company imported the product at issue—which turned out to be the plaintiff—would also soon face a patent infringement suit).

The Court acknowledges that it is a close question as to whether Plaintiffs have met their burden. UNEQUAL is, after all, correct that the record contains no reference to: (1) direct communications between it and adidas prior to suit, or direct threats from it to adidas regarding an imminent suit; (2) litigation between it and adidas prior to suit; or (3) infringement contentions or claim charts filed in the Reebok case that identified adidas products as accused products. (D.I. 10 at 8) But after considering whether "the totality of the circumstances establishes a justiciable controversy[,]" *Danisco U.S. Inc.*, 744 F.3d at 1327, for the reasons set out above, the Court concludes that they do. Therefore, having considered the allegations in the light most favorable to the Plaintiffs, the Court finds that Plaintiffs have established declaratory judgement jurisdiction as to non-infringement of the patents-in-suit.

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends that the District Court GRANT Defendants' Motion with respect to Count I of the Complaint, but DENY the Motion with respect to Count II of the Complaint.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss

of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted by not later than **November 30, 2016** for review by the Court, along with an explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated: November 23, 2016

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

22